## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Martin E. Lawson, Special Agent with U.S. Homeland Security Investigations, having been duly sworn and in my capacity as a Task Force Officer with the Federal Bureau of Investigation (FBI), state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. This affidavit is submitted in support of a Criminal Complaint against Defendant HUSAM AL NAJJAR for the following offense:  Illegal or Unlawful Alien in Possession of a Firearm or Ammunition in violation of Title 18, United States Code, Section 922(g)(5)(A).[1]

2. I am a Special Agent (SA) of the United States Department of Homeland Security (DHS) Immigration and Customs Enforcement (ICE) Homeland Security Investigations (HSI). I have been so employed since March 2004. I am currently assigned as a Task Force Officer (TFO) to the Federal Bureau of Investigation (FBI) Joint Terrorism Task Force (JTTF) in Toledo, Ohio. I have been so assigned since 2010. I have experience investigating violations of federal law, including immigration, firearms, fraud, money laundering, and terrorism offenses. I am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and am empowered to conduct investigations and to make arrests for violations of federal statutes. Previously, I worked as a Counterintelligence Special Agent in the US Army from March 1991 to February 1996. My official duties included conducting investigations involving espionage, subversion, and other national security violations of the Uniform Code of Military Justice (UCMJ) involving the US Army, its soldiers or employees, and its installations.

---

[1] 18 U.S.C. § 922(g)(5)(A) provides in pertinent part: "It shall be unlawful for any person … who, being an alien … is illegally or unlawfully in the United States … to … possess in or affecting commerce, any firearm or ammunition …."

3. This affidavit is intended to show only that there is sufficient probable cause for the requested Criminal Complaint and does not set forth all of my knowledge about this matter. The facts described in this affidavit are based on my own personal observations and involvement in this investigation, on information and reports provided by other agents and law enforcement officers, on audio and video recordings of relevant transactions, on information provided by sources of information, and on evidence collected during this investigation.

## FACTS ESTABLISHING PROBABLE CAUSE

4. In November 2022, the FBI received an anonymous complaint specifying in part that Toledo, Ohio resident HUSAM AL NAJJAR had no legal status in the United States, paid a United States citizen $20,000 to engage in a fraudulent marriage with him, and that AL NAJJAR was regularly in possession of multiple weapons. The complainant additionally detailed that AL NAJJAR used several companies to hide untaxed income which AL NAJJAR sent overseas, and that AL NAJJAR and several associates assisted in smuggling illegal aliens to the U.S. by way of AL NAJJAR's trucking companies. The FBI then began an investigation to determine the merits of the complaint.

### AL NAJJAR's Immigration History

5. In February 2023, your affiant reviewed the alien file of AL NAJJAR which confirmed that AL NAJJAR does not have lawful status within the United States. Because he does not have lawful status in the United States, AL NAJJAR is prohibited from possessing a firearm pursuant to 18 U.S.C. § 922(g)(5)(a).[2] AL NAJJAR's alien file contains information in the form of documents and statements submitted to the United States Government regarding AL

---

[2] AL NAJJAR has been approved for employment authorization through filing of Form I-765; however, this authorization does not change his status in the United States or authorize him to possess a firearm.

NAJJAR's background and attempts to gain lawful permanent resident status in the United States, as detailed below:

6. AL NAJJAR is a citizen of Jordan, where he resided prior to moving to the United States. In 2005, AL NAJJAR married Ala Azzam in Jordan. Four children were born of that marriage in 2007, 2010, 2011, and the youngest on September 11, 2014. AL NAJJAR was issued a B-1/B-2 nonimmigrant, visitor visa in Amman, Jordan on or about August 28, 2014. A B-1/B-2 visa authorizes an individual to temporarily enter the United States for business or tourism purposes. It does not authorize permanent residence in the United States. AL NAJJAR's visa application indicated he was married and that he and his spouse, Azzam, were living together. On or about October 12, 2014, AL NAJJAR and Azzam were divorced in Jordan. Two weeks later, on or about October 26, 2014, AL NAJJAR was admitted into the United States in B-1/B-2 status, which was valid until on or about April 25, 2015.

7. According to JENILYN AIKEN, in February 2015, approximately four months after entering the United States, AL NAJJAR met AIKEN, who was a United States citizen. On or about March 12, 2015, AL NAJJAR married AIKEN in Toledo, Ohio. On or about April 26, 2015, AL NAJJAR overstayed his visa entry conditions, and became deportable as a result.

8. On or about May 15, 2015, AIKEN and AL NAJJAR submitted I-130, Petition for Alien Relative, and I-485, Application to Register Permanent Residence or Adjust Status, forms to United States Citizen and Immigration Services (USCIS) in an attempt to gain lawful status for AL NAJJAR. An I-130 form is an application for a United States citizen to establish a relationship to an eligible relative who wishes to come to or remain in the United States. An approved I-130 does not itself grant legal status but recognizes a citizen's or lawful permanent resident's relationship to a relative. The relative must then submit a further application for

lawful permanent resident status. An I-485 form is an application for lawful permanent resident status for a person already in the United States. The I-130 and I-485 forms require that they be signed and certified to contain true information under penalty of perjury. On or about October 27, 2015, officers from USCIS conducted a site visit at AL NAJJAR and AIKEN's residence, which was then at a different location in Toledo, Ohio, and not the TARGET RESIDENCE. During the visit AIKEN expressed her desire to withdraw the I-130 petition. She completed a form withdrawing the petition because she felt AL NAJJAR married her for "his Green Card". The I-130 and I-485 were subsequently denied for fraud by USCIS on or about November 3, 2015.

9. On or about December 8, 2015, AIKEN filed new I-130 and I-485 forms on behalf of AL NAJARR. On or about October 15, 2016, AIKEN submitted an online tip to Homeland Security Investigations (HSI) claiming AL NAJJAR admitted he married her for the sole purpose of obtaining immigration benefits. Due to an administrative error, the tip from AIKEN to HSI was not immediately forwarded to USCIS.

10. On or about September 24, 2019, USCIS inadvertently approved the I-130 application, but not the I-485, which was denied on or about June 17, 2017. An approved I-130 does not convey any benefits or status to a beneficiary, it merely establishes that a familial relationship exists, and that once approved, the appropriate I-485 can be adjudicated. Once the tip from AIKEN was forwarded to USCIS, the approved I-130 was revoked on or about May 10, 2022, and USCIS denied the I-130 for fraud. USCIS sent a notice of denial to Aiken and AL NAJJAR. At this time, AL NAJJAR clearly did not have lawful status in the United States, which remains true at the time of this affidavit.

### AL NAJJAR's Possession of Firearms

11. On or about July 12, 2023, the FBI interviewed an individual who formerly had direct access to AL NAJJAR. This individual claimed AL NAJJAR asked about smuggling illegal aliens into the U.S, that AL NAJJAR had paid a U.S. Citizen $20,000 to engage in a marriage fraud, and that AL NAJJAR has multiple businesses in other people's names so that AL NAJJAR could keep the business if he got into trouble. The individual stated that AL NAJJAR had multiple weapons and that AL NAJJAR frequently carried a pistol in a belt holster. The individual claimed that AL NAJJAR kept an AR-15 and an AK variant rifle at his office. The individual directed the FBI interviewers to two videos on a TIK TOK account used by AL NAJJAR that show AL NAJJAR manipulating two pistols in what appears to be AL NAJJAR's office in Toledo.

12. On or about October 16, 2023, the FBI reviewed the TIK TOK account used by AL NAJJAR and located the two videos, which were posted on May 9, 2022, and September 9, 2022, respectively, depicting AL NAJJAR manipulating what appears to be a black Glock pistol in one video and in possession of a separate tan Glock pistol with an inserted magazine in the second video. The below screenshots were taken from each of the described videos from AL NAJJAR's TIK TOK account:

 

13. Investigators have also received information from a confidential source of information (hereinafter "S-1") with direct access to AL NAJJAR.[3] On or about August 11, 2023, the FBI interviewed S-1. During the interview, S-1 claimed that AL NAJJAR possesses a pistol and carries it on his hip all the time.

14. On or about October 19, 2023, S-1 reported that he had not seen AL NAJJAR carry a pistol recently and that AL NAJJAR must keep his pistol at home. S-1 advised that AL NAJJAR does not have a concealed carry permit and understands he is not allowed to possess a pistol. AL NAJJAR told S-1 that he bought his pistols from an individual rather than a business, but AL NAJJAR did not provide further details.

15. On or about November 2, 2023, S-1 reported being present when AL NAJJAR removed an unloaded pistol from AL NAJJAR's SUV in conjunction with letting an associate drive it. S-1 observed AL NAJJAR handle the pistol between tucking the pistol in the waistband of his pants and placing it on the dashboard of a different vehicle.

---

[3] S-1 has been cooperating with the FBI as part of this investigation with hopes of receiving immigration benefits since S-1 is illegally in the United States and wants to be able to stay in the country. S-1 has conducted consensual monitoring with AL NAJJAR and has provided reporting that has been verified by the FBI. S-1 has ongoing direct access to AL NAJJAR. S-1 has not been compensated by the FBI.

16. On or about December 13, 2023, S-1 reported that AL NAJJAR's pistol must be kept at his house or in AL NAJJAR's car.

17. On or about January 10, 2024, S-1 reported that he saw that AL NAJJAR had a video on his phone where AL NAJJAR is visible firing a pistol towards an unidentified target. Based upon the timing of the video, S-1 stated that AL NAJJAR was on a work trip at the time and must have transported the pistol in one of AL NAJJAR's semi-trucks.

18. On or about January 31, 2024, S-1 provided the FBI with the above-described video depicting AL NAJJAR firing an unidentified pistol and said that AL NAJJAR sent the video from a WhatsAPP account. A review of the video shows AL NAJJAR firing an unidentified pistol from what appears to be the open window of a vehicle. Two screenshots from the video are included below:

 

19. On or about March 5, 2024, your Affiant viewed a Tik Tok account with the username @hussamalnjjar0. This account was previously determined to be associated with AL NAJJAR by records provided to the FBI by Tik Tok on or about January 29, 2024. The latest video posted to the account depicted AL NAJJAR at what appeared to be an indoor shooting

7

range. In the video, AL NAJJAR can be seen firing what appears to be an AK-variant rifle and what appears to be a black pistol at a paper target. AL NAJJAR is clearly visible in the video. The video was not dated but was listed as being posted "2 days ago" as of March 5, 2024. The below screenshots were taken from the video:

  

20. Based on review of the video and publicly available photos of indoor gun ranges in the area, it was determined the range where the video was taken was Midwest Shooting Center in Taylor, Michigan. On March 8, 2024, agents interviewed the assistant manager and also reviewed limited surveillance footage. They learned that AL NAJJAR and two of his known associates rented range time on March 2, 2024. They brought at least three firearms with them to the range. They did not rent any weapons there. They purchased 100 rounds of 9mm ammunition, 80 rounds of 5.56 ammunition which is used by AR-15 style rifles, and 40 rounds of 7.62x39 ammunition which is used by AK-47 style rifles. They also purchased three sets of hearing protectors and three pair of protective eyewear. The assistant manager noted that AL NAJJAR and his two associates were subsequently banned from the establishment due to their disruptive and unsafe conduct, in particular, AL NAJJAR.

21.     On or about March 14, 2024, agents executed a search warrant at AL NAJJAR's residence in Toledo, Ohio. During the search of the residence, agents located a Glock, Model 45, 9mm pistol with serial number BKDX883 in the nightstand next to the bed in AL NAJJAR's bedroom.

22.     On or about March 14, 2024, agents advised AL NAJJAR of his *Miranda* rights and then interviewed AL NAJJAR. During the interview, AL NAJJAR admitted that he purchased the Glock pistol found in his residence for $500. He admitted that he carried it with him when he traveled. He also admitted that he took it with him to the shooting range in Michigan described above. AL NAJJAR admitted that he knew he was not permitted to possess a firearm.

**CONCLUSION**

23. Based on the above information, your affiant believes probable cause exists that HUSAM AL NAJJAR has committed a violation of Title 18, United States Code, Section 922(g)(5)(A) (alien illegally or unlawfully in the United States in possession of a firearm or ammunition).

Respectfully submitted,

_____
Martin E. Lawson
Special Agent
Homeland Security Investigations
Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn to via telephone
after submission by reliable electronic means
on March  14 , 2024. Fed.R.Crim.P. 4.1 and 41(d)(3).

_____
HONORABLE DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE